J-S12031-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| TONI L. BOERNER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BEST BUY ROOFING, LLC AND BEST | : | No. 1968 EDA 2023 |
| BUY ROOFING AND GENERAL | : | |
| CONTRACTORS, LLC | : | |

Appeal from the Order Entered June 27, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  201000874

BEFORE:  DUBOW, J., SULLIVAN, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED MAY 14, 2024**

Appellant, Toni L. Boerner, appeals from the trial court's June 27, 2023 order awarding no damages to Ms. Boerner after conducting a trial to assess damages following the entry of a default judgment against Appellees, Best Buy Roofing, LLC, and Best Buy Roofing and General Contractors, LLC.  We affirm.

On October 14, 2020, Ms. Boerner initiated this action by filing a praecipe for writ of summons against Appellees.  On October 19, 2021, Ms. Boerner filed a complaint against Appellees, asserting claims of trespass and property damage-intentional tort.  Therein, she alleged that she owned property at 4600 E. Howell Street, Philadelphia, Pennsylvania 19135 (the "Property"), and that, on or about July 17, 2019, Appellees "by and through their agents, servants, representatives, workmen and/or employees

purposefully entered upon the Property and vandalized the roof of the Property by, *inter alia*, installing a new roof and/or removing the existing roof without the knowledge or consent of [Ms. Boerner], thereby trespassing upon and damaging the Property." Complaint, 10/19/21, at ¶¶ 4, 5. Ms. Boerner said that Appellees "thereafter sent their agents, servants, representatives, workmen and/or employees to the Property on other occasions without permission, thereby trespassing upon the Property." *Id.* at ¶ 6. According to Ms. Boerner, as a result of Appellees' actions, she "was caused to suffer property damage, financial losses, business losses, damages and inconveniences. [She] was caused financial damages as a result of the actions of [Appellees], including money spent on remediation efforts, loss of revenue, loss of income[,] and other sums." *Id.* at ¶¶ 14, 15.

On December 13, 2021, Ms. Boerner filed a praecipe to enter default judgment, citing Appellees' failure to answer or otherwise respond to her complaint within twenty days of service. Thereafter, the trial court scheduled a bench trial to assess damages.[1]

_____

[1] ***See*** Pa.R.Civ.P. 1037(b)(1) (stating that, when a default judgment is entered, "[t]he prothonotary shall assess damages for the amount to which the plaintiff is entitled if it is a sum certain or which can be made certain by computation, but if it is not, the damages shall be assessed at a trial at which the issues shall be limited to the amount of the damages").

J-S12031-24

The trial took place on March 8, 2023.[2]  Both parties were represented by counsel.  Ms. Boerner testified first.  She stated that she owned the Property and used it to operate a daycare center called Tender Loving Childcare.  N.T., 3/8/23, at 5.  Ms. Boerner recalled that, in 2019, her insurance company required that she have a roof inspection performed on the Property.  *Id.* at 7, 11.  As a result, Ms. Boerner said she contacted Appellees in March of 2019, and paid them $250 to perform an inspection.  *Id.* at 11-12.  Ms. Boerner introduced Exhibit P-1, which was a check Ms. Boerner wrote

_____

[2] No exhibits from the trial were transmitted to us with the certified record. We note that "[i]t is the obligation of the appellant to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal." *Commonwealth v. Shreffler*, 249 A.3d 575, 584 (Pa. Super. 2021) (citation omitted).  "Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty." *Commonwealth v. Preston*, 904 A.2d 1, 7 (Pa. Super. 2006) (citation omitted). *See also* Explanatory Comment (2004) to Pa.R.A.P. 1931 ("In order to facilitate counsel's ability to monitor the contents of the original record which is transmitted from the trial court to the appellate court, [Pa.R.A.P. 1931(d)] requires that a copy of the list of record documents be mailed to all counsel of record, or to the parties themselves if unrepresented, and that the giving of such notice be noted on the record.  Thereafter, in the event that counsel discovers that anything material to either party has been omitted from the certified record, such omission can be corrected pursuant to Pa.R.A.P. 1926.").

After making an informal inquiry to the trial court, we were able to obtain Ms. Boerner's exhibits.  However, Appellees' exhibits remain missing from the record.  We admonish Ms. Boerner for her failure to ensure that the record certified on appeal included the exhibits.

- 3 -

to Appellees for the inspection. *Id.* at 13.[3] According to Ms. Boerner, upon performing the inspection, Appellees gave Ms. Boerner a certificate that showed that "the roof was in fine shape, had no leaks, no problems, et cetera," and suggested to Ms. Boerner that she have the roof inspected on a yearly basis. *Id.* at 12.[4] Ms. Boerner said that she never asked Appellees to put a new roof on the building. *Id.* at 14.

About a week later, around April 1, 2019, Ms. Boerner said she was away from the Property at an appointment when her staff called to tell her that Appellees were on the roof of the Property installing a new roof. *See id.* at 14-15. Ms. Boerner said she then called Appellees, relaying that she did not want a new roof and to get their workers off of the roof. *Id.* at 15. Ms. Boerner relayed that she eventually made it to the Property and saw Appellees working on the roof. *Id.* at 16. She said that, although she asked the workers to get off of the roof, the workers "were only speaking Spanish and acted like

_____

[3] The check, dated March 25th, appears to contain language, stating: "Roof inspection can be used as dep. toward a roof[.]" *See* Exhibit P-1 (unnecessary capitalization omitted).

[4] Ms. Boerner identified Exhibit P-2 as "the inspection." *Id.* at 13. Our review of Exhibit P-2 shows that it is a one-page document entitled "CONTRACT FOR SERVICES" and is dated February 22, 2019. *See* Exhibit P-2. It contains the contact information for both Appellees and Ms. Boerner. Based on our reading of the handwritten note on the document, it appears to state: "Roof is not currently leaking. Upon inspection the decking under shingles roofs is [illegible]. It's recommended to have roofs inspected annually." *See* Exhibit P-2 (unnecessary capitalization omitted). We note that Ms. Boerner later stated that the date on Exhibit P-2 is incorrect, and that Appellees performed the inspection on March 25, 2019. N.T. at 47.

they didn't understand what I was saying." *Id.* at 17. Ms. Boerner testified that they put shingles on top of the existing roof and did not leave until they were done. *Id.*

Subsequently, on July 17, 2019, Ms. Boerner said that Appellees returned to the Property, and threatened her to either give them money or else they were going to take all the shingles off of the roof. *Id.* at 19-21. According to Ms. Boerner, Appellees returned later that night after the daycare closed and "took back their shingles. They took back their roof. They ripped them off and caused a tremendous amount of damage to my existing roof that was there before all of this." *Id.* at 23.[5] Ms. Boerner stated that she discovered what Appellees did to the roof the next morning, and called the police. *Id.* at 24. In addition, Ms. Boerner said that she contacted her insurance company. *Id.* at 24-25. Ms. Boerner explained that it cost $9,500 to repair the roof; she thought that the insurance company gave her $5,500 for the roof repairs and she stated she paid the remainder. *Id.* at 25. She said the repairs were performed in September and October of 2019. *Id.* Before the repairs were done, however, Ms. Boerner said that there was "a terrible storm" in early August of 2019, which resulted in a "[t]remendous amount of water damage." *Id.* at 25, 26. Ms. Boerner detailed:

---

[5] Exhibit P-3 was an exhibit of photographs that Ms. Boerner said she took on July 17th and 18th of 2019. *Id.* at 18-24, 54-55. However, she acknowledged that none of the photographs were dated. *Id.* at 66. They, *inter alia*, depict the condition of the roof. *See* Exhibit P-3.

- 5 -

The part of the roof, whether they came back and did more damage or it just took two weeks for the rain, you know, to make that much damage, but it came in through the roof. It poured down the walls inside the classroom. Water was all over the floor. And water did what water does, which is run down. And our basement was, the carpets were soaking wet, the walls, just everything. It was just everything was soaking wet.

*Id.* at 26 (*verbatim*). As a result of the water damage, Ms. Boerner stated that a company called Pro Serve had to perform repair work. *Id.* at 27. Ms. Boerner said she had to pay some of the repair costs out of her own pocket, but she could not recall how much she paid. *Id.*

Because of the damage to the roof and the water damage inside of the Property, Ms. Boerner asserted that her daycare business had to close. *Id.* at 28-29. She said that August of 2019 was the last month she had children enrolled in the daycare, and that her business remained closed at the time of trial. *Id.* at 29, 34. She explained that her business is regulated by the Department of Human Services, *id.* at 28, and that the business has not reopened because "there's a long procedure with the Department of Human Services. Even though we had everything repaired, it's a long procedure to get to court. Then we went through COVID, and there was no court so it has stretched out. As of now, going into year 2023, we have been closed since 2019 because of this." *Id.* at 29. She further testified that the Department of Human Services has given her approval to open the daycare with

conditions, but seemed to indicate that those conditions have not been met yet. *Id.*[6]

Ms. Boerner conveyed that the daycare center made revenue by either parents' paying their children's tuition or through state subsidies. *Id.* at 30. She then answered questions about Exhibit P-4, which is a spreadsheet she said showed how much revenue the daycare would have brought in if it had been open. *Id.* at 30-34.[7] In addition, Ms. Boerner discussed the daycare

---

[6] Specifically, Ms. Boerner testified:

[Ms. Boerner's attorney:] At this point, has the Department of Human Services ever given approval for you to open the daycare?

[Ms. Boerner:] Yes, with conditions.

[Ms. Boerner's attorney:] Have those conditions been able to be met?

[Ms. Boerner:] Yes.

[Ms. Boerner's attorney:] Are they met at this point?

[Ms. Boerner:] They aren't met at this point, and regardless, we still have to wait for all the procedures, such as the next court date, the next hearing date, et cetera. So until all that is done, I can't reopen.

*Id.* at 29.

[7] Our review of Exhibit P-4 reveals that it is a one-page spreadsheet entitled "Totals [*sic*] Loss of Income[.]" Exhibit P-4 (unnecessary capitalization omitted). It contains columns for August 2019, September 2019, October 2019, November 2019, December 2019, and January 2020. It has three rows; the first is entitled "Private Pay[,]" the second is entitled "Subsidized[,]" and the third is entitled "Total[.]" *Id.* (unnecessary capitalization omitted). By adding the "Private Pay" and "Subsidized" rows together for each month, the spreadsheet sets forth the total loss of income as follows: $16,667.32 for August 2019; $18,735.36 for September 2019; $20,164.76 for October 2019;
*(Footnote Continued Next Page)*

center's past tax returns (which were introduced as Exhibit P-5), and the gross profits that it received in previous years. *Id.* at 35-37. She also spoke about the daycare center's expenses, such as the costs for the mortgage, insurance, utilities, and real estate taxes, and Ms. Boerner noted that she had defaulted on the mortgage. *Id.* at 38-39. She said that the mortgage payment is $1,087/month, the insurance costs $4,000/year, taxes amount to $2,000, trash disposal is $600/year, and utilities are $150/month. *Id.* When asked about her intentions with the daycare business, Ms. Boerner explained that she had originally planned to re-open. *Id.* at 39. However, at the time of trial, Ms. Boerner said she was not sure if she would sell it or start it back up again. *Id.* at 40.

On cross-examination, Ms. Boerner was questioned about whether she brought this lawsuit in her individual capacity or on behalf of the daycare. *Id.* at 41-42.[8] She recognized that the daycare's name was not on the front of the complaint, and that the verification at the end of the complaint was signed by herself, individually. *Id.* at 41-42. In addition, she admitted that she did not bring her individual tax returns, or proof that she paid real estate taxes, insurance, utilities, and the mortgage over the past several years. *Id.* at 43-44. She also agreed that she did not know how much she personally brought in from running the daycare business in 2015, 2016, 2017, 2018, and 2019.

---

$18,735.36 for November 2019; $19,450.06 for December 2019; and $20,164.76 for January 2020. *Id.*

[8] Exhibit D-1, a copy of the complaint, was introduced. *Id.* at 40.

*Id.* at 45. She also did not bring tax records to show what she individually made in 2020, 2021, and 2022. *Id.* She said that she created Exhibit P-4, the spreadsheet that purported to show the daycare center's revenue for August 2019 and thereafter, and agreed that she would not put all of the daycare's income into her own pocket. *Id.* at 45-46.

Ms. Boerner was also questioned about Exhibit P-1, *i.e.*, the check she said she wrote to Appellees for the inspection. *Id.* at 47-48. Ms. Boerner stated that she made a copy of the check before she gave it to Appellees' salesman. *Id.* at 48. She denied making changes to the check after she copied it, and she confirmed that she hand-wrote on the check that the "[r]oof inspection can be used as a deposit towards roof" before she gave it to Appellees. *Id.* at 48-49. Appellees then presented Exhibit D-2, which they said is a copy of the check from Ms. Boerner that Appellees cashed. *Id.* at 49-50. Based on the transcript, it appears that Exhibit D-2 did not contain the language "roof inspection can be used as[,]" but only said "deposit towards roof." *Id.* Ms. Boerner said she did not know how that language was added to the check after it was given to Appellees on March 25, 2019. *Id.* at 50.

While Ms. Boerner maintained that she called the police on July 17, 2019, after Appellees' workers began threatening her, she conceded that she did not bring a copy of a police report with her to the trial. *Id.* at 51-53. She recalled that, by the time the police arrived, the workers had left. *Id.* at 53. She also confirmed that she did not bring any photographs to show the water damage to the interior of the building that occurred in early August of 2019,

and she did not have any documents from her insurance company to show that it compensated her for those damages. *Id.* at 59. Similarly, Ms. Boerner stated that she did not bring a copy of a check to show that her insurance company compensated her to have a new roof installed, and she had no documents or photographs from Pro Serv — the remediation company — with her. *Id.* at 60-61.

Ms. Boerner was asked about the COVID-19 pandemic, and whether she was seeking damages for the period of time that her daycare could not have operated due to government shut-down orders. *Id.* at 61-63. She disagreed that she was seeking damages for a period of time that her daycare could not have operated, and she asserted she received no payments from the government during that time. *Id.*

When asked if Ms. Boerner paid Appellees for the new roof installed in April of 2019, she answered no. *Id.* at 66. She explained that, after she was forced to get a new roof due to the damage caused by Appellees and the later water damage, she hired a company called Freedom Roofing to install a new roof in September or October of 2019. *Id.* at 67. However, Ms. Boerner did not have any documentation to show that Freedom Roofing installed a new roof. *Id.* Ms. Boerner stated that she believed Freedom Roofing charged $9,000 to install the new roof, of which her insurance company paid $4,500 and she paid the rest. *Id.* at 68. She said she had no copy of a check to show the court in support of her testimony. *Id.*

Ms. Boerner then rested, and Appellees called Richard Young to testify. *Id.* at 70. He stated that he was the owner of Best Buy Roofing, LLC, and that Best Buy Roofing and General Contractors, LLC is the "[s]ame company." *Id.* He recalled that, in 2019, a friend told him that she knew a woman who needed a roof, as the woman's business was going to be shut down because of issues with the business's roof, fire alarm, and HVAC system. *Id.* at 71. As a result, he called Ms. Boerner and sent a salesman over to give her an estimate. *Id.* at 73. Prior to February of 2019, Mr. Young stated that he had previously installed a concrete sidewalk for Ms. Boerner. *Id.* at 72. Mr. Young confirmed that the check he cashed from Ms. Boerner — Exhibit D-2 — said "[d]eposit toward roof." *Id.* at 73. Mr. Young said that Appellees and Ms. Boerner entered a contract for "a re-roofing system on the shingles only" at a price of $6,500. *Id.* Thereafter, in about the end of March or April of 2019, Mr. Young said Appellees went to the Property and put a new roof on as contracted. *Id.* at 74-75. When asked if Appellees were paid by Ms. Boerner, Mr. Young answered:

> We received a $250 deposit. Because of her hardship, we were willing to work with her because of that. And we requested payments. And many months later, she said, "We never hired you to do the roof."
>
> And I was, like, it was very disturbing, very disturbing.

*Id.* at 76. Mr. Young said he received no complaints from Ms. Boerner during the summer of 2019, and he denied sending anybody back to the Property to tear off the roof. *Id.*

- 11 -

On cross-examination, Mr. Young said that he did not have the signed contract with him showing that Ms. Boerner hired Appellees to install a new roof, or any documents proving that he did work for Ms. Boerner prior to February of 2019. *Id.* at 78. He confirmed that Appellees perform roof inspections, which cost about $300. *Id.* at 78-79. In addition, he stated that Appellees have not filed a complaint against Ms. Boerner seeking payment for the roof. *Id.* at 79.

Ms. Boerner then provided rebuttal testimony. She stated that the only time she ever talked to Mr. Young was on the day that Appellees' workers came to threaten to tear off the roof, and she said that she spoke to him on the phone and "it wasn't a pleasant phone call. And he hung up on me and he told me he was sending his guys back later and they were taking back the roof, which is what happened." *Id.* at 82. Ms. Boerner additionally denied that Appellees had done concrete work for her in the past. *Id.* at 85.

Mr. Young then provided rebuttal testimony, explaining the circumstances under which he had performed concrete work for Ms. Boerner in the past. *Id.* at 86. He said that Ms. Boerner herself had let him inside the daycare. *Id.* at 87.

At the conclusion of the trial, the trial court directed the parties to submit findings of fact and conclusions of law on the issue of damages. *Id.* at 88. The parties complied. On June 27, 2023, the trial court entered an order, in which it awarded no damages to Ms. Boerner. It stated that Ms. Boerner "failed to submit credible evidence sufficient to establish damages beyond

mere speculation." Order, 6/27/23, at 1 (single page). In a footnote, it elaborated:

> [Ms. Boerner], whose testimony was riddled with inconsistencies, failed to present documents evidencing any loss allegedly suffered. There was no documentary evidence of any payment (*i.e.*[,] receipt, letter, cancelled check, etc.) or costs (*i.e.*, bill, invoice, contract, etc.) incurred as a result of [Appellees'] acts. There was no documentary evidence that her business was closed due to the actions of [Appellees]. [Ms. Boerner] failed to present expert testimony nor did she provide documents to allow the court to form a basis for loss of profit damages.

*Id.* at 1 n.1 (single page).

On July 5, 2023, Ms. Boerner filed a post-trial motion. On July 10, 2023, the trial court denied the motion. Ms. Boerner filed a notice of appeal on July 26, 2023, stating that she was appealing from the trial court's June 27, 2023 order.[9] The trial court directed her to file a Pa.R.A.P. 1925(b) concise

---

[9] We recognize that, following the bench trial on damages and the disposition of Appellant's post-trial motion, no judgment was entered on the docket. This Court has previously explained that "the entry of judgment is a prerequisite to our exercise of jurisdiction." *Mackall v. Fleegle*, 801 A.2d 577, 580 (Pa. Super. 2002) (citations omitted). *Accord Knudsen v. Brownstein*, 2019 WL 4273894, at *1 n.1 (Pa. Super. filed Sept. 9, 2019) (recounting that, following the entry of default judgment and a trial on damages, the appellant had originally appealed from an order disposing of post-trial motions and that such appeal was quashed as premature given that judgment had not yet been entered); *see also* Pa.R.A.P. 126(b) (stating that unpublished non-precedential memorandum decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value). Nevertheless, though this appeal is subject to quashal due to the failure to enter judgment below, "in the interests of judicial economy[,] we will regard as done that which ought to have been done." *Mackall*, 801 A.2d at 581 (citation and quotation marks omitted). *See also id.* at 580-81 (proceeding to the merits of the appeal, even though no judgment was entered below). Like the *Mackall* Court, however, "we caution the parties against disregarding the procedural rules of this Commonwealth in the future." *Id.* (footnote omitted).

statement, and she timely complied. The trial court did not issue a separate Rule 1925(a) opinion, but relied on the reasons set forth in its June 27, 2023 order.

Presently, Ms. Boerner raises the following questions for our review:

[1]. Whether the [t]rial [c]ourt erred as a matter of law and/or abused its discretion in entering the [o]rder of June 27, 2023 in this matter, in that the [c]ourt's decision finding in favor of [Appellees] and awarding [Ms. Boerner] no damages is inconsistent with the testimony and documentary evidence presented at trial.

[2]. Whether the [t]rial [c]ourt erred as a matter of law and/or abused its discretion in entering the [o]rder of June 27, 2023 in this matter, in that the testimony and documentary evidence presented at trial supports an award of damages in favor of [Ms. Boerner].

[3]. Whether the [t]rial [c]ourt erred as a matter of law and/or abused its discretion in entering the [o]rder of June 27, 2023 in this matter, in that the [c]ourt's decision finding in favor of [Appellees] and awarding [Ms. Boerner] no damages is against the weight of the evidence and not supported by the testimony and evidence presented at trial.

[4]. Whether the [t]rial [c]ourt erred as a matter of law and/or abused its discretion in entering the [o]rder of June 27, 2023 in this matter, in that the [c]ourt's decision finding in favor of [Appellees] and awarding [Ms. Boerner] no damages is inconsistent with Pennsylvania law.

Ms. Boerner's Brief at 4-5.

Though Ms. Boerner raises four separate issues, her argument in support of each issue is the same. She argues:

The testimony presented by [Ms. Boerner] at trial and the documentation admitted into evidence by [Ms. Boerner] at trial support an award of damages in favor of [Ms. Boerner], as

- 14 -

requested in [Ms. Boerner's] Proposed Findings of Fact and Conclusions of Law. (RR, 24a-30a).[10]

The Order is against the weight of the evidence and is not supported by the testimony and evidence of record. On the basis of all the testimony and evidence, which is beyond mere speculation, no reasonable fact finder could conclude that [Ms. Boerner] is not entitled to any damages in this matter. (RR, 34a-121a).[11] Further, the failure to award [Ms. Boerner] damages in this matter is inconsistent with Pennsylvania law and constitutes an error of law and/or an abuse of discretion. *See, e.g.*, *Nykiel v. Heyl*, 838 A.2d [8]08 (Pa. Super. 2003).

Contrary to the conclusions of the [t]rial [c]ourt, the entry of a default judgment against [Appellees] resolves the issue of liability and demonstrates that [Ms. Boerner's] business was closed due

---

[10] This citation primarily refers to Ms. Boerner's proposed findings of fact and conclusions of law filed below. Therein, Ms. Boerner generally cited to Exhibits P-4 and P-5 to support her claim that she "sustained average lost profits of $843,775.65 between August 2019 and April 2023." Proposed Findings of Fact and Conclusions of Law, 4/24/23, at ¶ 23. She then stated that, as the daycare continues to be unable to operate, she will "sustain a loss of profits on average of $18,750.57 per month for each month the daycare center is closed and unable to operate." *Id.* at ¶ 24. She also claimed, without citation to any evidence, that she will "sustain financial losses for having to personally pay expenses for the Property and the daycare center, such as the mortgage, taxes and utilities, from August 2019 to the present, in excess of $4,000 per month. Over 45 months, [Ms. Boerner] would have sustained damages in the amount of $180,000.00." *Id.* at ¶ 25. Ultimately, she concluded that she has "sustained damages presently in the amount of $1,023,775.60[,] and will continue to sustain damages in the amount of $22,750.57 per month." *Id.* at ¶ 26. She specifically asked for no other damages in her proposed findings of fact and conclusions of law aside from these sums. *See id.* ("Wherefore, [Ms. Boerner] respectfully requests that this Honorable Court enter judgment in favor of [Ms. Boerner] and against [Appellees], individually, jointly and severally, in a sum in the amount of $1,023,775.60, with damages continuing to be assessed at $22,750.57 per month until [Ms. Boerner's] daycare center reopens, as well as interest at the statutory rate, court costs and such other and further relief as the [c]ourt deems appropriate and just under the circumstances.").

[11] This citation references virtually the entire trial transcript appearing in the reproduced record.

to the actions of [Appellees]. Also, [Ms. Boerner's] testimony and the documentation admitted into evidence at trial transcends mere speculation, was largely unrebutted[,] and demonstrates that [Ms. Boerner's] business was closed due to the actions of [Appellees], as well as that [Ms. Boerner] suffered financial damages and/or losses as a result of [Appellees'] conduct. (RR, 34a-121a). Further, [Ms. Boerner's] Proposed Findings of Fact and Conclusions of Law are not based upon speculation and provide the basis for calculating an award of damages in favor of [Ms. Boerner] based on the testimony and evidence in this matter. (RR, 24a-30a).

Expert testimony was not required or necessary for [Ms. Boerner] to establish that she sustained financial losses or damages, as [Ms. Boerner] presented the necessary testimony and information and provided a calculation of her damages based upon her business records and her knowledge of her businesses [*sic*]. Further, documentary evidence was not necessary for [Ms. Boerner] to establish that the daycare was closed as a result of [Appellees'] actions. The entry of the default judgment alone accomplishes this, and [Ms. Boerner's] testimony clearly stated the reasons why the business was closed.

Therefore, the [t]rial [c]ourt's Order is not supported by substantial evidence or the appliable [*sic*] law, and constitutes an error of law and/or abuse of discretion. As a result thereof, this Court should reverse the Order of the [t]rial [c]ourt and remand the matter with instructions to either grant [Ms. Boerner] a new trial or mold the Order to reflect an award of damages in favor of [Ms. Boerner] and against [Appellees].

Ms. Boerner's Brief at 11-12. **See also** Ms. Boerner's Brief at 13-14 (same), 15-16 (same), 16-18 (same).

We deem Ms. Boerner's argument waived. Initially, Ms. Boerner seems to only seek damages for the daycare's lost profits and operating expenses, as they are the only specific damages she pinpoints in her argument, as well as in her proposed findings of fact and conclusions of law filed below. In any event, while Ms. Boerner maintains that the trial court's decision to award no

- 16 -

damages is against the weight of the evidence and is not supported by the record, she does not meaningfully discuss any of the testimony or evidence proffered at the trial. *Accord* Appellees' Brief at 8 ("[N]owhere in the [b]rief does [Ms. Boerner] cite to any specific testimony or evidence that supports her position and analyze any of the testimony and evidence in relation to her claim for damages.").[12] In addition, the only legal authority that she cites in support of her argument is *Nykiel*. As Appellees discern, however, Ms. Boerner does not explain or develop how *Nykiel* supports and relates to her claims, instead providing only a general, vague citation to it. *See id.* at 6-7 (internal citation omitted). Furthermore, although Ms. Boerner insists that the entry of the default judgment established that the daycare closed due to the actions of Appellees, she does not cite any legal authority in support of this specific proposition. *See also* Appellees' Brief at 11 ("[Ms. Boerner] argues that the entry of [d]efault [j]udgment established the fact of damages regarding her business losses. [Ms. Boerner] does not argue that the [d]efault [j]udgment established the fact of any other damages, and … does not cite any case law in support of this proposition.") (citation omitted).

_____

[12] Like the argument section of her brief, Ms. Boerner's statement of the case similarly does not cite to, or discuss, any of the testimony elicited at the trial. *See* Pa.R.A.P. 2117(a)(4) (requiring "[a] closely condensed chronological statement, in narrative form, of all the facts which are necessary to be known in order to determine the points in controversy, with an appropriate reference in each instance to the place in the record where the evidence substantiating the fact relied on may be found").

It is well-established that, "[w]hen briefing the various issues that have been preserved, it is an appellant's duty to present arguments that are sufficiently developed for our review." *Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007) (citation omitted). "The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities. Citations to authorities must articulate the principles for which they are cited." *Id.* (citations omitted). Further, "[t]his Court will not act as counsel and will not develop arguments on behalf of an appellant." *Id.* (citation omitted).[13] This Court has declined to reach the merits of an issue where "the argument section of [the a]ppellant's brief merely consists of general statements unsupported by any discussion and analysis of relevant legal authority." *Coulter v. Ramsden*, 94 A.3d 1080, 1088 (Pa. Super. 2014). Moreover, we will not "scour the record to find evidence to support an argument." *Slomowitz v. Kessler*, 268 A.3d 1081, 1105 (Pa. Super. 2021). Ultimately, "when defects in a brief impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived." *Hardy*, 918 A.2d at 771 (citations omitted).

---

[13] *See also Commonwealth v. Williams*, 782 A.2d 517, 532 (Pa. 2001) (Castille, J., concurring) ("This Court is neither obliged, nor even particularly equipped, to develop an argument for a party. To do so places the Court in the conflicting roles of advocate and neutral arbiter. … The practice of fashioning arguments for a party is also unfair to the would-be responding party, which will only learn upon receipt of the Opinion that the Court perceived the argument, and thus will have been deprived of an opportunity to respond.").

Here, because Ms. Boerner fails to discuss any specific evidence or legal authority in support of her argument that she is entitled to damages, we deem Ms. Boerner's issues waived. We decline to develop arguments on her behalf.[14] No relief is due.

_____

[14] Ms. Boerner emphasizes that "the entry of a default judgment against [Appellees] resolves the issue of liability and demonstrates that [Ms. Boerner's] business was closed due to the actions of [Appellees]." Ms. Boerner's Brief at 11. *See also id.* at 12 ("[D]ocumentary evidence was not necessary for [Ms. Boerner] to establish that the daycare was closed as a result of [Appellees'] actions. The entry of the default judgment alone accomplishes this, and [Ms. Boerner's] testimony clearly stated the reasons why the business was closed."). However, we point out that this Court has previously determined that "a plaintiff who obtains a default judgment in a tort action is **not** relieved of his obligation to provide evidence of a causal connection between the defendant's tortious conduct and the damages for which he seeks relief." **Knudsen**, **supra**, at *12 (emphasis added). In other words, despite the entry of default judgment pursuant to Rule 1037(b)(1), an appellant must still prove that his losses arose from the conduct that gave rise to the suit. **Id.** at *9 ("Because the prothonotary here entered a default judgment against [the appellee] pursuant to [Rule] 1037(b)(1), [the a]ppellant technically established liability and the only issue at trial was the amount of damages to which [the a]ppellant was entitled. Despite this posture, [the a]ppellant still needed to prove his injuries and losses arose from the conduct that gave rise to the suit…."). **See also Gall v. Crawford**, 982 A.2d 541, 547-48 (Pa. Super. 2009) (rejecting the buyers' argument that the trial court erred and abused its discretion in refusing to grant them damages for lost rent and lost use following the entry of default judgment); Appellees' Brief at 11 (citing **Knudsen**, **supra**, and arguing that the default judgment "only established the fact of trespass, and it was still up to [Ms. Boerner] to prove damages that were caused by [Appellees'] trespass"). Problematically, as set forth *supra*, Ms. Boerner does not address this case law, or proffer any countervailing authority.

Further, to the extent Ms. Boerner says her testimony established that the daycare closed because of Appellees, we note that the trial court found Ms. Boerner to be incredible and, on cross-examination, Appellees challenged her assertion that roof and water damage caused the daycare to close, resulting in the damages she claimed. **Cf. Nykiel**, 838 A.2d at 811
*(Footnote Continued Next Page)*

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/14/2024

_____

(determining that "[f]or the jury to award no damages in the face of … ***uncontroverted*** evidence represents a disregarding of the evidence that cannot be allowed to stand") (emphasis added); ***see also Ferraro v. Temple Univ.***, 185 A.3d 396, 401, 404 (Pa. Super. 2018) (noting that "[t]he findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury[,]" and that the finder of fact "is free to believe all, none or some of the evidence and to determine the credibility of the witnesses") (citations omitted); Order, 6/27/23, at 1 n.1 (the trial court's opining that Ms. Boerner's testimony was "riddled with inconsistencies"), N.T. at 29 (Ms. Boerner's stating that the daycare closed because of the damage to the roof and the water damage that was inside the Property); ***id.*** at 34 (Ms. Boerner's agreeing that the last month she had any children enrolled in the daycare was August of 2019); ***id.*** at 59 (Appellees' asking Ms. Boerner if she had any photographs to show the damage to the interior of the Property in August of 2019, to which she indicated she did not have them with her); ***id.*** (Ms. Boerner's stating that she does not have any documents with her showing that her insurance company compensated her for the damages to the interior of the Property in 2019); ***id.*** at 61 (Appellees' asking Ms. Boerner if she had any documents from the remediation company, Pro Serv, to which she indicated she did not have them with her); ***id.*** at 61-63 (Appellees' asking Ms. Boerner about the COVID-19 pandemic's effect on her business); ***id.*** at 67 (Appellees' asking Ms. Boerner if she has any documents to show that Freedom Roofing put a new roof on, to which Ms. Boerner answered she did not have any such documents with her).  In addition, we reiterate that Ms. Boerner identifies no other specific evidence to support that Appellees' actions caused the daycare to close, let alone for nearly four years.